Filed 1/6/22  In re J.R. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B312290 (Los Angeles County Super. Ct. No. 18CCJP04718) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOHNNY R., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

_____

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] Johnny R. (Father) challenges the sufficiency of the evidence supporting jurisdictional findings against him under section 300, subdivisions (a) and (b) that he physically abused his five-year-old son J.R., as alleged in a subsequent petition under section 342. We affirm, based on the substantial evidence in the record that supports the findings.

## BACKGROUND

### I.    The Family

Jennifer M. (Mother), who is not a party to this appeal, and Father separated when Mother was pregnant with J.R. In March 2017, when J.R. was two years old, a family court awarded Father sole legal and physical custody of J.R., with visitation for Mother.

### II.    Section 300 Petition Regarding Father's Drug Use

In July 2018, Father twice tested positive for methamphetamine, after the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging Father's home was unsanitary and Father was not providing adequate care for J.R. DCFS detained J.R. from Father, placed the child with Mother, and filed a dependency petition under section 300, subdivision (b).

---

[1] Further statutory references are to the Welfare and Institutions Code.

2

On October 9, 2018, the juvenile court sustained count b-1 in the section 300 petition, as follows:

"[Father] has a history of substance abuse and is a current abuser of amphetamine and methamphetamine which renders [Father] incapable of providing regular care for the child. On 7/3/18 and 7/12/18, [Father] had positive toxicology screens for amphetamine and methamphetamine. The child is of such young age [then three years old] requiring constant care and supervision and [Father]'s substance abuse interferes with providing regular care and supervision of the child. [Father] is a Registered Controlled Substance Offender and has a criminal history of a conviction of Possession of a Narcotic Controlled Substance, Possession of a Controlled Substance for Sale and Possession of a Controlled Substance. [Father]'s substance abuse endangers the child's physical health and safety and creates a detrimental home environment, placing the child at risk of serious physical harm and damage."

At disposition, the juvenile court declared J.R. a dependent of the court, removed him from Father's care, and released him to Mother. The court granted Father enhancement services and monitored visitation with J.R. The court ordered Father to complete a case plan consisting of a full drug and alcohol program with aftercare, a developmentally appropriate parenting program, and individual counseling to address case issues, including home living conditions, criminal history, and drug use.

In January 2019, J.R. was deemed eligible for Regional Center services based on diagnoses of autism spectrum disorder and intellectual disability.

## III. Section 342 Petition Regarding Mother's Drug Use

On September 23, 2019, Mother pleaded no contest to an amended subsequent dependency petition under section 342; and the juvenile court sustained count b-1, alleging Mother's occasional marijuana use and failure to participate in Regional Center services for J.R.'s physical and mental health needs placed J.R. at risk of harm. The court granted Father unmonitored visitation with J.R.

At an October 28, 2019 disposition hearing, the juvenile court removed J.R. from Mother's care. Over DCFS's objection, the court released J.R. to Father. The court ordered family preservation services for Father and modified his case plan so it only required drug testing upon suspicion of use.

At a section 364 review hearing on August 28, 2020, the juvenile court found Father and Mother in compliance with their case plans. Over DCFS's objection, the court ordered J.R. placed in the home of both parents. J.R. remained a dependent of the court.

## IV. Section 342 Petition Regarding Father's Physical Abuse of J.R.

In October 2020, DCFS received a referral alleging domestic violence between Mother and her boyfriend (the father of one of J.R.'s half siblings). On November 17, 2020, while DCFS's investigation of the referral against Mother was pending, Mother called DCFS and reported she observed a one-and-one-half-inch linear bruise on the inner part of J.R.'s right leg. According to Mother, J.R. (then five years old) told her that Father was mad, and he hit J.R. really hard with a belt, causing J.R. pain. Mother also reported J.R. would scream when it was time to shower because he was afraid Mother was going to give

4

him a cold shower. According to Mother, J.R. told her that Father gave him cold showers. The same day Mother made the referral, a social worker received photographs reflecting the bruise on J.R.'s leg, and the social worker submitted a referral for a medical appointment to assess J.R.'s injury.

J.R. received a medical examination the same day, November 17, 2020. He repeatedly told the examiner that Father had hit him with a shoe, as he pointed to the lower portion of his right leg. He also stated Father hit him with a belt, but he was "[u]nable to demonstrate where he was hit with a belt," according to the examiner. The examiner reported J.R. "is autistic and has poor concept of time."

The following day, on November 18, 2020, Mother and J.R. met with police officers. The police report states, in pertinent part: "I [the reporting officer] asked the child [J.R.] what happened. The child stated that his daddy hit him with a belt. I then asked the child why his daddy hit him with a belt. The child stated that his daddy hit him with a belt because he was playing with the phone and he didn't give the phone back to daddy when daddy told him to give it back. I asked the child how many times his daddy hit him. The child stated one time. I asked the child if he was scared of his daddy and he nodded his head up and down."

On November 19, 2020, the social worker visited Mother, J.R., and J.R.'s four half siblings at the children's maternal grandmother's home. The social worker observed the bruise on the inside of J.R.'s right leg, below his knee. The bruise was approximately one-and-one-half inches long and one inch wide. The social worker asked J.R. what happened to his leg, and he responded: " '[M]y daddy hit me real hard' "; " 'he hit me on the bed when I wanted my i[P]ad.' " J.R. also said Father "was very

mad" during this incident. J.R. "pushed on his leg and said 'ouch.'" According to the social worker, J.R. "could not give a meaningful statement to when it occurred or what [Father] used to hit him," and the social worker "did not go further into questioning J[.R.] as the ER CSW [emergency response child social worker] ha[d] not made contact with J[.R.] to investigate the allegations." During this same visit, the maternal grandmother reported to the social worker that J.R. told her Father "hit him real hard with a belt."

On December 1, 2020, the emergency response child social worker contacted Father regarding the physical abuse allegation. Father said he would scold J.R. for using bad language, but he had never hit him. Father told the social worker he did not understand why J.R. would say something like that. Father suggested someone might have "told [J.R.] what to say or put words in his mouth."

Also on December 1, 2020, the emergency response social worker visited Mother and Johnny at the maternal grandmother's home. The social worker found it "hard to engage [J.R.] in conversation." When Mother and the maternal grandmother tried to assist the social worker, J.R. addressed them with profanity. Mother told the social worker she was surprised when J.R. said that Father hit him. She had never suspected abuse because she believed Father spoiled J.R. Mother also stated, however, that she believed Father needed to be more patient with J.R. because of J.R.'s autism. The social worker showed J.R. a photograph of the bruise on his leg (which had since disappeared) and asked him what happened. J.R. did not respond other than to state, " 'This is my ouchie.' " J.R. repeatedly asked the social worker to take him to Father's home.

6

When the social worker asked if Father "was a nice guy or bad," J.R. replied, " 'A nice guy.' "

On December 2, 2020, the social worker spoke with Father's counselor at a community services agency where Father received counseling once a week. The counselor reported she had offered Father parenting techniques, but he did not "follow through" with them, although he acknowledged J.R. "continue[d] not listening to him." Rather than implement the parenting techniques the counselor suggested, Father stated he "prefer[red] to wait to take a parenting class for autistic children." According to the counselor, Father said he did not hit J.R. The counselor believed Father did not discipline J.R. at all. She was surprised by the allegation of physical abuse because Father "seem[ed] to have a lot [of] patience with his son," and he had "worked very hard to have his son."

On December 7, 2020, DCFS filed an application requesting authorization to remove J.R. and his half siblings from Mother due to the domestic violence between her and her boyfriend. The same day, the juvenile court issued the order. DCFS detained J.R. from Mother and contacted Father to pick him up. According to DCFS's December 14, 2020 Detention Report, J.R. "was observed happy [*sic*] going with [Father]. During this contact J[.R.] kept saying he wanted to go with his daddy."

On December 9, 2020, DCFS filed a section 342 subsequent petition under section 300, subdivisions (a) and (b), alleging Mother's violent verbal and physical altercations with her boyfriend placed J.R. and his half siblings at risk of harm. The petition also alleged under section 300, subdivisions (a) and (b):

"On or about November 2020, [Father] physically abused the child. [Father] struck the child with a belt, causing the child

7

to obtain a bruise on his right leg. The physical abuse of the child by [Father] endangers the child's physical health and safety and places the child[] at risk of serious physical harm, damage, and physical abuse." (Counts a-1 & b-1.)

At detention hearings held on December 14 and 15, 2020, the juvenile court made a prima facie finding that J.R. was a person described by section 300 based on the allegations in the December 9, 2020 section 342 subsequent petition. DCFS recommended the court detain J.R. from Mother and order him to remain released to Father. The court ordered J.R. released to the care of both parents.

## V. Adjudication/Disposition of December 9, 2020 Section 342 Subsequent Petition

As set forth in DCFS's February 25, 2021 Jurisdiction/Disposition Report, on February 1, 2021, a dependency investigator interviewed J.R.'s half siblings, J.R., and Mother regarding the allegations in the December 9, 2020 section 342 subsequent petition. The eldest of J.R.'s half siblings, who was 10 years old, told the investigator J.R. reported Father hit him with a belt. The second eldest, who was almost eight years old, said J.R. reported that Father hurt him with a belt and shoes. When the investigator inquired of J.R., the child stated: " 'Mom slapped me in the arm. Dad slapped me in the leg.' " The investigator was unable to obtain further details from J.R. because J.R. "did not want to/was unable to provide further details."

Mother told the investigator J.R. "sometimes make[s] up statements and thinks it is funny." Mother believed J.R. when he told her Father hit him with a belt because J.R. "did not laugh afterwards," and she observed the bruise on J.R.'s leg. Mother

8

said when she confronted Father about J.R.'s report, Father admitted he hit J.R. with a belt. Mother also told the investigator that J.R. "mentioned that [F]ather hit him 'at least 9-10 times,' " but Mother never saw a mark or bruise except on November 17, 2020, when she reported it. According to Mother, J.R. regressed developmentally after this incident, as he started "wetting himself," even though he had been toilet trained for a couple years. He also now flinched whenever Mother raised her hand.

On February 4, 2021, the dependency investigator interviewed the half sibling's father who was named in the domestic violence counts against Mother in the December 9, 2020 section 342 subsequent petition. He stated J.R. reported Father "hit him hard" because Father "was angry with him."

On February 8, 2021, the dependency investigator visited J.R. and Father at Father's home. The investigator observed "much more dialogue and interactions" between Father and J.R. than she had observed between Mother and J.R. The investigator reported: "J[.R.] would repeatedly say, 'Daddy, daddy, daddy,' [and] Father would respond, 'Yes, papi?' J[.R.] would then say, 'Hi,' 'I love you,' or ask for something." When J.R. asked Father to bring him a cup of juice that was within J.R.'s reach, Father "walked over and handed it to J[.R.] with a smile." The investigator "observed no obvious behaviors of fear during the contact." J.R. did not answer the investigators questions regarding the allegations against Father.

Father denied the abuse allegation and told the dependency investigator "the situation was 'fishy,' " as J.R. "had one bruise on his leg which he could have gotten from falling." Father learned of the allegation from Mother, who yelled at him and said J.R. did

9

not want to visit him.  Father did not believe J.R. did not want to see him.

The dependency investigator also reported the following regarding her interview with Father:  "Father stated he is having trouble with J[.R.]'s behavior because he would not go to sleep and would play on the tablet.  Father explained he has to wake up at 4:00AM [*sic*] every day, so he is trying to go to bed by 10:00PM [*sic*], but sometimes J[.R.] would refuse.  Father said he does not really follow through if J[.R.] refuses, and does not know how to get J[.R.] to listen.  Father expressed that he needs help from behavioral therapists, but has been having trouble being linked due to COVID-19.  Father stated Family Preservation is assisting him through the process."

On February 10, 2021, the dependency investigator spoke to a detective who stated the city attorney's office would probably reject the case against Father for physical abuse of J.R.

In the Jurisdiction/Disposition Report, DCFS stated Father "downplayed the incident of inappropriate discipline."  DCFS also reported J.R. was doing well in Father's care, and J.R.'s behavior had improved since he reunified with Father, as "evidence by the fact that his tantrums have diminished."  DCFS recommended the juvenile court sustain counts a-1 and b-1 regarding Father's physical abuse of J.R., based on J.R.'s consistent statements to the medical examiner and law enforcement.

On February 25, 2021, the juvenile court held the adjudication and disposition hearings on the December 9, 2020 section 342 subsequent petition.  The court admitted DCFS's reports into evidence, including the reports discussed above, and took judicial notice of the prior findings and orders in the case. DCFS struck the domestic violence allegations against Mother

10

from the petition. DCFS's counsel and J.R.'s counsel asked the court to sustain the physical abuse allegations against Father, arguing J.R. was consistent in his statements to Mother, his half siblings, the medical examiner, and the police officers regarding Father striking him on his leg. Father's counsel urged the court to dismiss the allegations against him, arguing the evidence was insufficient. The court sustained counts a-1 and b-1 against Father, finding the allegations true by a preponderance of the evidence.

Turning to disposition, the juvenile court ordered J.R. to remain released to the care of both parents. J.R. remained a dependent of the court. The court modified Father's case plan to require five random or on-demand consecutive drug tests, individual counseling to address case issues, counseling with J.R., and family preservation services.

## VI. Appeal and Termination of Dependency Jurisdiction

Father appealed, challenging the jurisdictional findings against him in the December 9, 2020 section 342 subsequent petition. On June 16, 2021, during pendency of this appeal, the juvenile court terminated dependency jurisdiction in this matter and issued a final custody order granting Father and Mother joint legal and physical custody of J.R.[2] Father's time to appeal from the order terminating jurisdiction and the final custody order has expired, and he has not filed a notice of appeal challenging either order.

---

[2] On September 2, 2021, we granted DCFS's request for judicial notice of these June 16, 2021 orders.

11

## DISCUSSION

### I. We Decline to Dismiss the Appeal As Moot and Exercise Our Discretion to Review Father's Challenge to the Jurisdictional Findings

An order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot where the appellate court cannot provide effective relief. (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488; *In re S.G.* (2021) 71 Cal.App.5th 654.) "[D]ismissal for mootness in such circumstances is not automatic, but 'must be decided on a case-by-case basis.' " (*In re C.C.*, at p. 1488.)

Father asks us not to dismiss his appeal as moot, although he has not challenged the termination of dependency jurisdiction or the final custody order. Father asserts that the physical abuse findings could prejudice him in future family law or dependency proceedings. We may exercise our discretion to hear an otherwise moot appeal where the asserted " 'error infects the outcome of subsequent proceedings,' " including "the possibility of prejudice in subsequent family law [or dependency] proceedings." (*In re C.C.*, *supra*, 172 Cal.App.4th at pp. 1488-1489.) A juvenile court's finding that a parent intentionally physically harmed his child is certainly the type of finding that could prejudice a parent in a subsequent family law or dependency proceeding. Accordingly, we exercise our discretion to review Father's challenge to these jurisdictional findings.

### II. Legal standards for jurisdiction under section 300, subdivisions (a) and (b) and analysis

Jurisdiction under section 300, subdivision (a), is appropriate where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm

inflicted nonaccidentally upon the child by the child's parent or guardian.  For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian that indicate the child is at risk of serious physical harm.  For purposes of this subdivision 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks if there is no evidence of serious physical injury."  Jurisdiction under section 300, subdivision (b) requires proof the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child . . . ."  (§ 300, subd. (b)(1).)  "Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300."  (§ 355, subd. (a).)

In deciding whether there is a substantial risk of serious physical harm or illness, within the meaning of section 300, subdivisions (a) and (b), courts evaluate the risk that is present at the time of the adjudication hearing.  "While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm."  (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 824, abrogated in part on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 627-629.)  The "juvenile court need not wait until a child is seriously injured to assume jurisdiction if there is evidence that the child is at risk of

13

future harm . . . ." (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 993.)

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)

On appeal, Father does not dispute there is substantial evidence in the record demonstrating he intentionally struck five-year-old J.R. on the leg with an object, causing pain and bruising to the child. He asserts, however, that this court must reverse the physical abuse jurisdictional findings against him because there is insufficient evidence in the record showing J.R. was at risk of harm at the time of the adjudication hearing, as the juvenile court left J.R. in his care and J.R. was happy and comfortable there. We disagree with Father's assertion.

As set forth above, a few days after the incident, J.R. told a social worker that Father hit him with a belt when he was on the bed because he wanted to play with his iPad. Similarly, J.R. told a police officer that Father hit him with a belt because he was playing with a phone, and he did not give the phone back to Father when Father asked for it. Around two weeks before the adjudication hearing, Father informed DCFS that he was "having trouble with J[.R.]'s behavior because he would not go to sleep

14

and would play on [a] tablet"; and he "need[ed] help from behavioral therapists" to address this behavior. Thus, at the time of the adjudication hearing, Father was having difficulty with the same behavior that led him to strike J.R., and he had not yet received the professional help he sought to deal with the behavior.

Substantial evidence demonstrates that at the time of the adjudication hearing, the risk that Father would inflict serious physical harm on J.R.—"based on the manner in which a less serious injury was inflicted"—was an ongoing, current risk. (§ 300, subd. (a).) We have no cause to disturb the juvenile court's physical abuse jurisdictional findings against Father.

## DISPOSITION

The February 25, 2021 jurisdictional findings and disposition order are affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15